**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 2:22-cr-20105-MSN** |
| | ) | |
| **TIMOTHY EDWARDS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION ON MOTION TO SUPPRESS

Before the Court is Defendant Timothy Edwards's Motion to Suppress, filed March 27, 2023. (ECF No. 25.) The United States responded in opposition on May 5, 2023.[1] (ECF No. 29.) District Judge Mark S. Norris referred the motion to the undersigned for report and recommendation on May 12, 2023. (ECF No. 33.) The parties jointly submitted that a hearing was unnecessary (ECF No. 37), and the previously set hearing was cancelled (ECF No. 38).

Based on the entire record in this case, the Court recommends that the motion be granted.

## PROPOSED FINDINGS OF FACT

On June 3, 2021, Detective R. Lee applied for a warrant to search the premises at 4889 Briona Street, Memphis, Tennessee 38125, by completing and executing, under oath, an affidavit

---

[1] The United States purports to attach two exhibits to the response—the search warrant at issue and a Miranda Rights Waiver Form—but no exhibits are in fact attached. The Court will therefore rely on the copy of the search warrant already on the docket (ECF No. 25-1), as the United States does not appear to take issue with that version. In addition, Edwards does not appear to dispute that he waived his *Miranda* rights; in light of the recommendation herein, the United States' failure to provide that waiver form is not material for purposes of deciding the instant motion.

for a search warrant.  (ECF No. 25-1.)  As grounds for issuance of the search warrant, Detective

Lee first provided general information about drug investigations.  (*Id.* at 3.)  He stated that the

basis of this information was his own training and experience, including his "involvement in

prior drug investigations and searches" and in "debriefing confidential informants and

cooperating individuals in prior drug investigations," as well as information from other law

enforcement officers.  Though the affidavit refers to Detective Lee's "career as a Law

Enforcement Officer as previously described," no such description of his career (or employer or

job description) is provided, other than a reference to his "Narcotics Unit."

 Detective Lee stated that, "generally," as "a common practice," drug traffickers store

their inventory, paraphernalia, distribution records, financial records, and large sums of money in

their residences.  (*Id.*)  He explained that traffickers keep their records "close at hand so as to

readily ascertain current balances" and similarly keep their clients' and suppliers' contact

information "immediately available in order to efficiently conduct their drug trafficking

business."  He also stated that traffickers typically possess firearms and other dangerous weapons

to protect themselves, their drugs, and their profits.  Detective Lee described that he had been

involved "[i]n a substantial number of residential searches executed in connection with . . . drug

investigations" and that the evidence "typically" recovered included drugs, distribution records,

contact information, financial records and instruments, precious metals and gems, travel

documents, and firearms and other dangerous weapons.  He also stated that, in prior

investigations by his Narcotics Unit, such evidence had "typically been recovered from the main

residence, as well as other structures and areas on the property being searched."

Detective Lee then went on to describe the investigation at issue. (*Id.* at 4.) He stated

that, on June 3, 2004,[2] Shelby County Sheriff's Office ("SCSO") Sergeant Simonsen, a task

force officer assigned to the Drug Enforcement Agency ("DEA"), gave information to the SCSO

Narcotics Division that the DEA was investigating a package suspected of containing marijuana

that had been received at the UPS Store on Poplar Avenue in Germantown, Tennessee. (ECF

No. 25-1, at 4.) DEA agents utilized an "NNDDA Certified K-9 Drug Detector Dog 'Bruno' to

conduct a scan of a group of packages," and Bruno alerted to one addressed to Modish Swag

Boutique.[3] (ECF No. 25-1, at 4.) Officers obtained a search warrant for the package and

discovered 4.9 pounds of "a green leafy substance" consistent with marijuana that field tested

positive for THC. (*Id.*)

"A short time later," the DEA agents saw a gray Nissan Maxima pull up to the front of

the UPS Store. (*Id.*) Edwards was driving the car, with his girlfriend Tomeka Oliver as a

passenger; both of them were "known to the agents." Oliver entered the UPS Store and asked for

the suspect package, but "she did not obtain the package." Oliver returned to the Maxima, and

Edwards drove away. Approximately one hour later, Oliver returned to the UPS Store; this time

she was driving the Maxima. She entered the store, retrieved the package, and went back to the

car, at which point she was detained without incident.

---

[2] Though both parties describe this event as occurring on June 3, 2021 (ECF No. 25, at 3; ECF
No. 29, at 3), that date does not appear in the affidavit, nor does any other date.

[3] Here and elsewhere in their briefs, the parties provide information potentially relevant to the
facts alleged in the search warrant but not included in the affidavit. For example, both parties
state that Edwards and his girlfriend own a clothing business, leading Edwards to pick up
packages at the UPS Store regularly, and the United States asserts that Modish Swag Boutique is
that business. (ECF No. 25, at 2; ECF No. 29, at 2, 6.) The United States also relates that the
UPS employees stated that Edwards seemed to have a handgun on his side. (ECF No. 29, at 2.)
Because the determination of probable cause is limited to a review of the four corners of the
affidavit, the Court will not consider such extraneous facts. *See United States v. Dyer*, 580 F.3d
386, 390 (6th Cir. 2009).

Sergeant Simonsen advised that Edwards and Oliver were the "subject of an ongoing investigation involving the distribution of methamphetamine and marijuana." (*Id.*) Law enforcement officers had learned that Edwards and Oliver lived together at 4889 Briona Street, Memphis, Tennessee. That address was listed on Oliver's driver's license, and Edwards had an active utilities account there. Both had been seen at the residence, "coming and going on a regular basis." Both were observed driving two cars—a gray Nissan Maxima and a Mercedes— which were both registered at 4889 Briona in Oliver's name. Edwards's criminal history included charges of possession of a controlled substance with intent to distribute, robbery, weapons charges, and murder.

The affidavit then relays that, "[o]ver the course of this investigation, a recent package[4] was intercepted at the same above listed UPS Store that was addressed to Timothy Edwards."[5] (ECF No. 25-1, at 4.) Edwards and Oliver "were observed coming to the store and attempting to retrieve the package, however, it was not delivered to them and they were observed by Detectives to return directly to the address of 4889 Briona St." That package contained methamphetamine and marijuana "in large quantities." (*Id.*)

---

[4] The parties agree that this first incident occurred on April 1, 2021, at a different UPS Store on Hacks Cross Road. (ECF No. 25, at 1; ECF No. 29, at 1.) According to the parties, the manager called DEA agents to the store to investigate two packages received the day before, sent from California and addressed to Edwards. A UPS employee had opened one of the parcels and saw several vacuum-sealed packages of what appeared to be marijuana. The UPS employees told the officers that Edwards picked up packages regularly, as he and his wife owned a clothing business, and that he had come to the store inquiring about these packages before their delivery. While officers were at the store, Edwards returned but was told the packages still had not arrived. Officers saw Edwards leave in a black and white Mercedes and followed him to the residence at 4889 Briona, where they saw him pull into the garage and close the door. None of this information appears in the affidavit.
[5] The affidavit does not specify the recipient address on the package; it is therefore unknown whether it was addressed to Edwards care of the UPS Store or at his home address.

The affidavit concludes with the following:

> Detectives know through training and experience that individuals who sell illegal
> narcotics often receive their supply of products through postal/parcel services in
> an attempt to avoid detection by Law Enforcement.  Detectives also know through
> training and experience that said individuals keep records of purchases, records of
> sales, shipping documents, drug ledgers, drug paraphernalia, drug proceeds and
> additional narcotics/contraband within their residences.

(*Id.*)

Based on the affidavit, Judge James Lammey of the Criminal Court of Shelby County,

Tennessee, found probable cause that Oliver had in her possession "Drug Ledgers, Records of

Purchases, Records of Sales, Shipping Documents, Drug Paraphernalia, Drug Proceeds,

Electronic Storage Devices and Additional Narcotics/Contraband" and issued a warrant to search

the residence at 4889 Briona, as well as any automobiles and outbuildings associated with the

residence.  (*Id.* at 1.)  Judge Lammey signed the search warrant on June 3, 2021.  The search

warrant was executed the same day.  (ECF No. 29, at 6.)  According to the United States,

Edwards walked up to the house before the search began, as the scene was being processed.  (*Id.*)

As he was being detained, he stated that the residence was his home, that he sold marijuana, and

that his wife had already been arrested for picking up his package.  (*Id.*)  He directed officers to

the location of marijuana and cash inside the home.  (*Id.*)  Officers recovered marijuana, a drug

ledger, a digital scale, twenty-nine rounds of 9mm ammunition, $9,780 in cash, a handgun, and a

rifle during the search.  (*Id.*)

Edwards was taken into custody and transferred to an SCSO facility.  (*Id.*)  Following

advisement of his *Miranda* rights, Edwards provided a statement, confirming his ownership of

the marijuana Oliver attempted to retrieve from the UPS Store and the marijuana and firearms found in the residence.[6]

On May 12, 2022, a federal grand jury returned an indictment charging Edwards with one count of conspiring to possess with intent to distribute 500 grams or more of methamphetamine in violation of 21 U.S.C. § 841(a)(1) and 846, knowingly possessing with intent to distribute 500 grams or more of methamphetamine in violation of 21 U.S.C. § 841(a)(1), and two counts of knowingly possessing a firearm while having previously been convicted of a crime punishable by imprisonment for a term exceeding one year in violation of 18 U.S.C. § 922(g)(1).  (ECF No. 1.)

## PROPOSED CONCLUSIONS OF LAW

Edwards seeks suppression of the fruits of an illegal search unsupported by probable cause and of statements obtained derivatively from that search.

### I.    The Search Warrant for the Residence

A.    Probable Cause

The first issue before the Court is whether the affidavit to search 4889 Briona provided probable cause for issuance of the warrant.  The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation."  U.S. Const. Amend. IV.  "In reviewing the sufficiency of the evidence supporting probable cause, we are limited to examining the information contained within the four corners of the affidavit.  Nevertheless, when considering that information, we look to the totality of the circumstances."  *Dyer*, 580 F.3d at 390 (citing *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005); *Illinois v. Gates*, 462

---

[6] No evidence regarding the statement has been provided to the Court, and the Court therefore recounts the details of this statement as described by Edwards.  (ECF No. 25, at 6.)

U.S. 213, 230 (1983)); *see also United States v. Jackson*, 470 F.3d 299, 306 (6th Cir. 2006)

("Search warrant affidavits must be judged based on the totality of the circumstances, rather than

line-by-line scrutiny." (citing *United States v. Woosley*, 361 F.3d 924, 926 (6th Cir. 2004))).

     "'Probable cause is defined as reasonable grounds for belief, supported by less than prima

facie proof but more than mere suspicion,' and is found to exist when there is 'a "fair

probability" that evidence of a crime will be located on the premises of the proposed search.'"

*Jackson*, 470 F.3d at 306 (quoting *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990);

*United States v. Jenkins*, 396 F.3d 751, 760 (6th Cir. 2005)).  "There must, in other words, be a

*nexus* between the place to be searched and the evidence sought."  *United States v. Brown*, 828

F.3d 375, 381 (6th Cir. 2016) (quoting *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir.

2004)).  The reviewer of a search warrant application is "to make a practical, common-sense

decision," based on "all the circumstances set forth in the affidavit."  *Id.* (quoting *Gates*, 462

U.S. at 238).

     "The standard of review for determining the sufficiency of the affidavit 'is whether the

magistrate had a substantial basis for finding that the affidavit established probable cause to

believe that the evidence would be found at the place cited.'"  *United States v. Rodriguez-Suazo*,

346 F.3d 637, 643 (6th Cir. 2003) (quoting *United States v. Davidson*, 936 F.2d 856, 859 (6th

Cir. 1991)).  "[T]he magistrate's probable cause determination should be afforded great

deference."  *Id.* (quoting *Davidson*, 936 F.2d at 859).  That "deferential review is consistent with

'the Fourth Amendment's strong preference for searches conducted pursuant to a warrant.'"  *Id.*

(quoting *Gates*, 462 U.S. at 236).  Edwards bears the burden of proof.  *Id.* ("It is well settled that

in seeking suppression of evidence the burden of proof is upon the defendant to display a

violation of some constitutional or statutory right justifying suppression." (quoting *United States*

*v. Feldman*, 606 F.2d 673, 679 n.11 (6th Cir. 1979))).

Edwards challenges the sufficiency of the probable cause in the affidavit on a single

basis: that the affidavit fails to establish a nexus between the items to be seized and the residence

at 4889 Briona.  To establish a nexus, the affidavit must provide "reasonable cause to believe

that the specific 'things' to be searched for and seized are located on the property to which entry

is sought."  *United States v. Grant*, No. 21-3686, 2023 WL 119399, at *2 (6th Cir. Jan. 6, 2023)

(quoting *Frazier*, 423 F.3d at 532).  "This connection between the location and the evidence of

criminal activity must be 'specific and concrete, not vague or generalized.'"  *Id.* (quoting *Brown*,

828 F.3d at 382) (internal quotations omitted).

The United States submits that the following facts establish a sufficient nexus to search

4889 Briona:

> that the package that Oliver had picked up on June 3, 2021,[7] had been addressed
> to Oliver's business[8]; that the package contained marijuana; . . . that Edwards had
> driven Oliver in the gray Nissan Maxima and attempted to retrieve the package
> earlier that day[;] that Oliver returned in the same vehicle an hour later and took
> the package into her vehicle[;] that Oliver and Edwards were the subject of an
> ongoing narcotics investigation[;] that Edwards had attempted to retrieve a
> package from The UPS Store containing methamphetamine and marijuana before,
> but it was not delivered to him[; that] Edwards had returned directly to the 4889
> Briona Street address on that date[; that] Edwards and Oliver both resided at the
> house at 4889 Briona St., and Oliver's driver's license was associated with the
> address[; that] Edwards had active MLGW utilities in his name at that address[;
> that] he and Oliver were seen regularly coming and going from the residence[;
> and that] the cars that Edwards and Oliver were using to attempt to collect the
> packages full of controlled substances were registered to the 4889 Briona Street
> address.

---

[7] As discussed above, this date does not appear in the affidavit.
[8] As discussed above, the affidavit says the package was addressed to Modish Swag Boutique but
does not say that entity is Oliver's business.

(ECF No. 29, at 9–10.)  Much of this information leads to a conclusion Edwards does not

contest: that Edwards and Oliver lived together at 4889 Briona.  Thus, the fact that Edwards and

Oliver were frequently seen at 4889 Briona and had licenses, cars, and utilities associated with

the address does not help to resolve the dispute.  Nor does the United States indicate how the fact

that Edwards and Oliver drove cars registered to 4889 Briona—i.e., their own cars registered to

their home address—to pick up drug packages from the UPS Store makes it any more likely that

evidence of drug dealing will be found at their home than if they had driven cars registered to

some other address.  *See, e.g.*, *Brown*, 828 F.3d at 383 (finding that, where a defendant's car was

parked outside a location where drugs were present, a "more direct connection" was required to

establish a nexus to search the defendant's house, such as the defendant using the car to transport

drugs from his house); *see also United States v. Ward*, No. 22-1233, 2023 WL 370911, at \*3–4

(6th Cir. Jan. 24, 2023) (finding the "more direct connection" that was lacking in *Brown* to be

present where the defendant used his car to drive from his home directly to a controlled buy).

Relatedly, Edwards's decision to drive home after failing to pick up a package of drugs

does not create a reasonable probability that drugs would be found in his home.  Though

returning home after obtaining drugs can help to establish probable cause that drugs are in the

home, *see, e.g.*, *United States v. White*, 990 F.3d 488, 492 (6th Cir. 2021), returning home

without drugs does not.

Only two pieces of information in the affidavit possibly connect Edwards's alleged drug

dealing to his house.  The first is the affiant's knowledge and experience regarding drug dealers

keeping evidence of their crimes at their homes.[9]  But such evidence is not alone sufficient.

---

[9] The basis of the affiant's knowledge and experience is somewhat undeveloped in the affidavit.
For example, Detective Lee does not indicate who he works for, what his position or

*United States v. Fitzgerald*, 754 F. App'x 351, 361 (6th Cir. 2018) ("Our precedent does not support the district court's conclusion that the affiant's 'experience that evidence of drug activity can be found at the drug dealer's residence, alone, is sufficient to establish a nexus to search the residence.'" (quoting *Frazier*, 423 F.3d at 533)).

The second is the information suggesting Edwards and Oliver were engaged in ongoing drug activity. It is "'well established' that a nexus to search the home can exist if a suspect's drug dealing is 'ongoing' at the time the police seek the warrant." *United States v. Reed*, 993 F.3d 441, 448 (6th Cir. 2021) (quoting *United States v. Feagan*, 472 F. App'x 382, 392 (6th Cir. 2012)). "When an officer identifies 'recent, reliable evidence of drug activity,' that activity can provide a 'reason to believe that drugs or other evidence of crime [will] be found in the suspect's' home beyond the suspect's status as a drug dealer *alone*." *Id.* (quoting *United States v. McCoy*, 905 F.3d 409, 418 (6th Cir. 2018); *Peffer v. Stephens*, 880 F.3d 256, 273 (6th Cir. 2018)). In contrast, where a suspect has "engaged in, at most, one drug transaction," or the drug activity is "from a significant time ago," the nexus may be lacking. *Reed*, 993 F.3d at 449 (citing, *e.g.*, *Fitzgerald*, 754 F. App'x at 360; *United States v. Ward*, 967 F.3d 550, 555–57 (6th Cir. 2020)).

The Sixth Circuit has acknowledged its "struggle[]" in deciding when evidence that an individual is selling drugs creates probable cause to search that individual's home. *Reed*, 993

---

responsibilities are, or what his employment history is. On the other hand, the affidavit does relay that Detective Lee has been involved in previous drug investigations and searches and refers to "the affiants' [sic] Narcotics Unit," which indicates that Lee is a member of such a unit. In addition, the affiant discusses his reliance on the knowledge and experience of other law enforcement officers, which he may generally rely on. *See United States v. Stotts*, 176 F.3d 880, 885 (6th Cir. 1999) ("[A]n affiant may present hearsay, if the issuing judicial officer is reasonably assured that the information is reliable and credible."). For purposes of this motion, the Court will assume without deciding that the basis for Detective Lee's knowledge and experience is fully established in the affidavit.

F.3d at 444 (quoting *United States v. Ardd*, 911 F.3d 348, 351 (6th Cir. 2018)). The difficulty arises from two competing principles: "[o]n the one hand, probable cause to arrest a suspect does not necessarily establish probable cause to search the suspect's home," especially due to the Fourth Amendment's treatment of "the home as 'first among equals,'" entitled to "'core' protection." *Id.* at 447 (quoting *Florida v. Jardines*, 569 U.S. 1, 6 (2013)). "On the other hand, . . . many courts have acknowledged as a common-sense matter that a suspect's home often will be a likely place that the suspect has kept evidence of a crime." *Id.* (citing *United States v. Williams*, 544 F.3d 683, 688 (6th Cir. 2008)). "With categorical statements pointing in opposite directions," precedent demonstrates "the difficulty of providing 'guidance for such a fact-bound legal determination,'" particularly regarding drug trafficking cases. *Id.* at 448 (quoting *Brown*, 828 F.3d at 382; comparing, e.g., *United States v. Sumlin*, 956 F.3d 879, 886 (6th Cir. 2020) (finding that, "in the case of drug dealers, evidence is likely to be found where the dealers live," and thus "courts generally may find a nexus to search a drug dealer's home even when there is absolutely no indication of any wrongdoing occurring there") (internal quotations omitted), with, e.g., *Brown*, 828 F.3d at 383 (rejecting "the proposition that the defendant's status as a drug dealer, standing alone, gives rise to a fair probability that drugs will be found in his home")). The Sixth Circuit has "reconciled our caselaw in fact-specific ways." *Reed*, 993 F.3d at 448.

The facts stated in the affidavit in this case are not sufficient to create probable cause. As an initial matter, the only date provided in the affidavit is June 3, 2004, describing events that occurred seventeen years before the affidavit was executed—hardly evidence of ongoing drug activity. The affidavit's execution date of June 3, 2021, suggests that the reference to 2004 is a scrivener's error (a suggestion now confirmed by the parties); otherwise, the officers' decision to pursue a search warrant based on conduct that occurred on the same date seventeen years prior

would be highly coincidental.  On the other hand, review is limited to the four corners of the affidavit, and no other facts in this affidavit provide any reference point suggesting the incident happened more recently than 2004.  *Cf. United States v. Perry*, No. 06-20172, 2007 WL 1017570, at *12 (E.D. Mich. Apr. 3, 2007) (excusing a scrivener's error in a date because "the search warrant affidavit proceeds in chronological fashion, and the context of the affidavit as a whole makes clear that the mistaken year was merely a typographical error apparent even on a cursory reading of that document"); *see also United States v. Walker*, 534 F.3d 168, 171 (2d Cir. 2008) (excusing a scrivener's error in a date where other facts in the affidavit "eliminate[d] any doubt as to the correct year of the relevant events").  And though the affidavit also refers to another, "recent" package interception at the UPS Store, both Edwards and the United States interpret that incident to have been recent in time (and prior) to the June 3rd incident, not recent to the signing of the affidavit, which does seem to be the more reasonable reading of the affidavit.  (*See* ECF No. 25, at 5 (describing the undated incident as "the prior incident at the UPS Store"); ECF No. 29, at 10 (describing the undated incident as Edwards's attempt "to retrieve a package from The UPS Store containing methamphetamine and marijuana *before*" (emphasis added)).)  The inclusion of the incorrect date thus detracts from the affidavit's ability to establish ongoing drug activity (not to mention the potential staleness issues it creates).

But even ignoring the scrivener's error, the affidavit fails to allege the kind of ongoing drug activity sufficient to establish a nexus to search Edwards's home.  "No case suggests that a defendant's status as a drug dealer" alone creates the requisite nexus, "[b]ut it is yet unsettled how much additional evidence of drug activity is needed for a nexus to exist."  *Grant*, 2023 WL 119399, at *3.

> Some cases have said that this inference can be invoked only when there is "overwhelming evidence that the defendants [are] major players in a large,

ongoing drug trafficking operation." *Brown*, 828 F.3d, at 383 n.2.  But still others
have called only for "recent, reliable evidence of drug activity." *McCoy*, 905 F.3d
at 418.  At a minimum, we have required "facts showing that the residence had
been used in drug trafficking, such as an informant who observed drug deals or
drug paraphernalia in or around the residence." *Brown*, 828 F.3d at 383.

*Id.* at *3.[10]

In this case, the first option—"overwhelming evidence" that Edwards and Oliver are

"major players in a large, ongoing drug trafficking operation," *id.*—is not established in the

affidavit.  Edwards and Oliver are alleged to be associated with two deliveries of drugs—one

when Edwards drove Oliver to the UPS Store where she unsuccessfully attempted to retrieve a

package containing 4.9 pounds of marijuana, addressed to a business (Modish Swag Boutique),

which she ultimately retrieved,[11] and the other when Edwards unsuccessfully attempted to

retrieve a package from the UPS Store containing methamphetamine and marijuana "in large

quantities."  (ECF No. 25-1, at 4.)  Edwards is also alleged to have a prior charge (but not, as far

as we know, a conviction) for drug distribution, with no indication how much time has passed

since that charge.  Despite the indication that large quantities may be involved, these allegations

simply do not overwhelmingly show that Edwards or Oliver is a major player in an ongoing drug

trafficking organization.

---

[10] Edwards relies heavily on *Grant* in arguing against probable cause and the good faith
exception.  In *Grant*, however, though the searched property was rented by the defendant, the
defendant did not reside there, instead conducting only short visits to the property.  *Id.*  Due to
these factual distinctions from the instant case, the conclusions in *Grant* are of lesser
comparative value than the other cases discussed herein.

[11] The fact that Oliver, not Edwards, attempted (and later completed) retrieval of this package is
not necessarily relevant to the nexus determination, as the affidavit establishes that both Oliver
and Edwards lived at 4889 Briona, and thus the conduct of either could have resulted in evidence
being found at the home.  *See United States v. Pointer*, No. 22-1082, 2022 WL 17820539, at *5
n.2 (6th Cir. Dec. 20, 2022) ("[A]ny criminal activity linked to the apartment may support a
determination of probable cause to search it, as the requisite nexus is merely between the activity
and the location, not the defendant and the activity/location.").

The second option—"recent, reliable evidence of drug activity," *Grant*, 2023 WL

119399, at *3—is also inadequately demonstrated in this case. Though recent drug activity can

help to establish a nexus, no court has found recent activity sufficient on its own. *See, e.g.*,

*United States v. Sheckles*, 996 F.3d 330, 342 (6th Cir. 2021) (finding sufficient nexus based on

the defendant's work with an international drug-trafficking operation, his recent negotiations to

buy ten kilograms of cocaine, and the ping of a phone used to coordinate drug deals at the

residence); *Sumlin*, 956 F.3d at 886–87 (finding sufficient nexus where the defendant was a

known drug dealer and the defendant drove from his home to conduct a drug deal)[12]; *United*

*States v. Gunter*, 551 F.3d 472, 476, 481 (6th Cir. 2009) (finding sufficient nexus based on

information from an informant that the defendant was "in the cocaine business," had traveled out

of state to purchase cocaine, and was involved in multiple, kilogram-weight sales of cocaine);

*United States v. Miggins*, 302 F.3d 384, 388, 393–94 (6th Cir. 2002) (finding sufficient nexus

---

[12] *Sumlin* provides an example of the kind of "categorical statement" referred to in *Reed*, making a broad pronouncement of the facts necessary to show nexus that are not necessarily tied to the facts of the case. *Reed*, 993 F.3d at 448. *Sumlin* states that a showing that the defendant is engaged in drug activity and lives at the subject residence, "combined with the affiant officer's experience that drug dealers keep evidence of dealing at their residence, can be sufficient to demonstrate a nexus . . . even 'when there is absolutely no indication of any wrongdoing occurring at the residence.'" 956 F.3d at 879 (quoting *United States v. Goward*, 188 F. App'x 355, 358–59 (6th Cir. 2006)). The affidavit in *Sumlin*, however, set out a timeline based on texts between the defendant and his customer that "suggested that Sumlin was at his home when Carrie texted that morning, and then necessarily was leaving from his home to deliver the drugs to Carrie." *Id.* at 887. The indication that the defendant went directly from his home to a drug deal was important to the analysis: "We agree with the emphasis placed by the district court on the timing of the text messages between Carrie and Sumlin." *Id.* The case did, therefore, involve some indication of wrongdoing at the defendant's residence. *Goward*, the case quoted by *Sumlin*, involved a "large-scale marijuana trafficking operation run by" the defendant, where officers conducted multiple controlled purchases from the defendant and surveilled the delivery of a "large truck load of marijuana" to the defendant that he intended to break up into smaller units. 188 F. App'x at 356. *Goward* thus falls in the "major players in a large, ongoing drug trafficking operation" category described in *Reed*, not the "recent, reliable evidence of drug activity" category represented by *Sumlin*.

based on the defendant's recent receipt of a package of cocaine, his gang membership, and his

numerous prior convictions of cocaine charges).  That conclusion is inescapable; otherwise, the

nexus requirement would be eviscerated, satisfied by the prerequisite finding of criminal activity

(drug trafficking) alone.  Because none of these types of additional facts are present in this case,

and because none of Edwards's drug activity (even assuming it was recent) is associated with his

home, his drug activity cannot suffice to establish a nexus.

Neither Edwards's connection to drug activity nor the affiant's experience that drug

dealers keep evidence of their crimes in their home is sufficient to establish probable cause, nor

does the combination of these facts rise to the requisite level of suspicion under the totality of

these circumstances.  The affidavit establishes that two people involved in some level of drug

dealing lived at 4889 Briona, but it does not provide sufficient reason to believe evidence of that

drug dealing would be found at that residence.  The affidavit does not present a sufficient nexus

between the suspected criminal activity and the place to be searched, and it was therefore issued

without probable cause.

B.    Good Faith Exception

Even if the affidavit is unsupported by probable cause, the good-faith exception may

preclude application of the exclusionary rule.  Under that exception, "even if the search warrant

were found to be fatally defective, the evidence would not be suppressed 'if the seizure was

based on reasonable, good faith reliance on the warrant.'"  *United States v. Hills*, 27 F.4th 1155,

1192 (6th Cir. 2022) (quoting *United States v. Abboud*, 438 F.3d 554, 578 (6th Cir. 2006)).  "The

'good faith inquiry is confined to the objectively ascertainable question whether a reasonably

well trained officer would have known that the search was illegal despite the magistrate's

authorization.'"  *Id.* (quoting *United States v. Leon*, 468 U.S. 897, 922–23 (1984)).  "[T]he

burden rests on the government to prove that [the executing officer's] reliance on a warrant was objectively reasonable." *United States v. Linares*, No. 13-20368, 2015 WL 3870959, at *9 (E.D. Mich. May 4, 2015), *report and recommendation adopted*, 2015 WL 3874476 (E.D. Mich. June 23, 2015) (quoting *United States v. Rissew*, 580 F. App'x 35, 36 (2d Cir. 2014)).

The "sole purpose" of the exclusionary rule "is to deter future Fourth Amendment violations." *Davis v. United States*, 564 U.S. 229, 236 (2011) (citing, e.g., *Herring v. United States*, 555 U.S. 135, 141 (2009)). Its operation is thus limited "to situations in which this purpose is 'thought most efficaciously served.' Where suppression fails to yield 'appreciable deterrence,' exclusion is 'clearly . . . unwarranted.'" *Id.* (quoting *United States v. Calandra*, 414 U.S. 338, 348 (1974); *United States v. Janis*, 428 U.S. 433, 454 (1976)). In addition to deterrence, "[t]he analysis must also account for the 'substantial social costs' generated by the rule," which "almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence." *Id.* (quoting *Leon*, 468 U.S. at 907). Thus, "[f]or exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs." *Id.* (citing *Herring*, 555 U.S. at 141; *Leon*, 468 U.S. at 910).

That "cost-benefit analysis" focuses on "the 'flagrancy of the police misconduct' at issue." *Id.* at 238 (quoting *Leon*, 468 U.S. at 909). "When the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." *Id.* (quoting *Herring*, 555 U.S. at 144). "But when the police act with an objectively 'reasonable good-faith belief' that their conduct is lawful, . . . the 'deterrence rationale loses much of its force' . . . ." *Id.* (quoting *Leon*, 468 U.S. at 919). A warrant "'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable'"—a "bare bones affidavit"—"shows that the officer

16

recklessly relied on the judge's decision that probable cause existed for the warrant." *Reed*, 993

F.3d at 450 (quoting *Leon*, 468 U.S. at 923; *United States v. White*, 874 F.3d 490, 496 (6th Cir.

2017)).

      As relevant in this case, "[f]or an officer's reliance to have been reasonable, the

application must have provided 'a minimally sufficient nexus between the illegal activity and the

place to be searched.'" *McCoy*, 905 F.3d at 416 (quoting *Brown*, 828 F.3d at 385). A

"substantial basis" for that nexus is not required, "only 'some connection, regardless of how

remote it may have been—some modicum of evidence, however slight.'" *Id.* (quoting *White*,

874 F.3d at 497). "[A] link between the drug dealer's activities and his home that would be

insufficient to establish probable cause may suffice to establish good-faith reliance on the

warrant." *Id.* at 417 (citing *Frazier*, 423 F.3d at 537); *see also Reed*, 993 F.3d at 450 ("There

obviously 'must be daylight' between the two standards because *Leon*'s exception applies only

when an affidavit falls short of probable cause." (quoting *White*, 874 F.3d at 497)). However,

the affidavit must still "present some 'particularized facts that indicate veracity, reliability, and

basis of knowledge and go beyond bare conclusions and suppositions.'" *McCoy*, 905 F.3d at 416

(citing *United States v. McPhearson*, 469 F.3d 518, 526 (6th Cir. 2006)).

      Though this case represents a close call, the affidavit does not satisfy *Leon*'s good faith

standard, and the United States has not met its burden of showing that the officer's reliance on

the warrant was objectively reasonable. As discussed above, to establish a nexus, the affidavit

relates that Edwards had a prior drug charge (not conviction), that he and Oliver were involved

in the retrieval of two packages containing drugs from the UPS Store (one successful and one

unsuccessful), and that, in the affiant's experience, drug dealers keep evidence of their drug

dealing in their homes. None of that information, not even a modicum of evidence, shows a

connection between Edwards's alleged drug dealing and his home. Cases finding good faith demonstrate that more is required to meet the "minimally sufficient" threshold. *See, e.g.*, *United States v. Mitchell*, No. 21-5571, 2021 WL 5772534, at *6 (6th Cir. Dec. 6, 2021) (finding the minimally sufficient nexus satisfied where the affidavit described, inter alia, "a reliable CI who had recently observed drugs at Mitchell's house"); *Reed*, 993 F.3d at 451 (finding that evidence of the defendant's status as a drug dealer and his ongoing drug dealing—including multiple, recent controlled buys; suspicious transactions near his home; and "many prior drug convictions"—"sufficed to trigger our well established principle that if there is probable cause to suspect an individual of being an ongoing drug trafficker, there is a sufficient nexus between the evidence sought and that individual's home") (quotation omitted).

The United States relies on *United States v. Washington*, 380 F.3d 236 (6th Cir. 2004), to argue that the affidavit describes a sufficient nexus to warrant application of the good faith standard. In *Washington*, however, a critical fact linked the defendant's drug trafficking to the residence searched—the defendant "emerged from 3112 Crossgate *immediately* prior to conducting the second drug deal." *Id.* at 243. No such fact, and no such link, is seen in the affidavit in this case.

Can the training and experience of the affiant supply that link? *Brown* indicates the answer is no. In that case, a DEA agent applied for a warrant to search Brown's home based on his association with a known heroin trafficker. 828 F.3d at 378. The affidavit described how agents arranged a controlled purchase from the trafficker, watched the trafficker leave his home, and then conducted a traffic stop of the car the trafficker was driving. Brown was the passenger in that car; he and the trafficker were arrested. Agents seized $4,813 and two cell phones from Brown, one of which had the trafficker's number saved in it. On one of the phones was a text

18

message stating, "He said 1175 or 1125 for one," which was consistent with the local price of

one ounce of cocaine.  Agents then searched the trafficker's home, finding heroin, and they also

found Brown's car parked in front of the house, which a drug dog positively alerted to.  The

affiant attested that Brown had one prior arrest for a drug charge that he was acquitted of and one

drug conviction.  Based on those facts, agents sought to search Brown's home at the address he

had provided (the same address his car was registered to).  The affiant also attested that, "based

on his training and experience and that of other officers with whom he had discussed the case,

drug traffickers tend to keep in their residences and vehicles the types of items for which the

search warrant was requested." *Id.*

On review, the Sixth Circuit found no probable cause to search the defendant's home,

finding the affidavit "contained no evidence that Brown distributed narcotics from his home, that

he used it to store narcotics, or that any suspicious activity had taken place there." *Id.* at 382.

The court further refused to apply the good faith exception. *Id.* at 385.  Although agents waited

twenty-two days after the arrest to get a warrant to search Brown's home, they had discovered

"little new evidence," and "[n]either the text message nor the 12-year-old conviction was

probative of whether Brown was using his current residence for drug trafficking." *Id.*  "Save for

a passing reference to Brown's car registration, the affidavit is devoid of facts connecting the

residence to the alleged drug dealing activity," and thus it was "'so lacking in indicia of probable

cause as to render official belief in its existence entirely unreasonable.'" *Id.* at 386.  *But see*

*United States v. Schultz*, 14 F.3d 1093, 1098 (6th Cir. 1994) (applying the good faith exception

because, "although we have held that [the affiant's] 'training and experience' were not sufficient

to establish a nexus of probable cause between [the] crime and the [location to be searched], the

connection was not so remote as to trip on the 'so lacking' hurdle").

Just as in *Brown*, here the affidavit detailed Edwards's connection to his home and to drug activity, but the only connections between those two things were the use of cars registered to the home in the drug activity and the affiant's experience that drug dealers' homes contain evidence of their crimes. Because those two connections were insufficient in *Brown* to supply a minimally sufficient nexus, so too must they be here, and the good faith exception cannot apply. It is therefore recommended that the motion to suppress the fruits of the search of Edwards's home be granted.

## II.    **Edwards's Statement**

Edwards next seeks suppression of his statements to law enforcement. The Court takes the facts surrounding these statements as the parties present them; given that the parties forewent their opportunity for an evidentiary hearing based on their agreement that the motion to suppress does "not require the resolution of any factual disputes," it does not appear that either party disputes any of the facts set out in each other's briefs. (ECF No. 37.)

Edwards apparently made two sets of incriminating statements to the officers. The first occurred "[a]s Edwards was being detained," after approaching 4889 Briona on foot "[w]hile the scene was being processed, but prior to the search of the residence." (ECF No. 29, at 5.)[13] Edwards spontaneously told the officers that the residence was his, he sold marijuana, and his wife had been detained for picking up his package, and he told the officers where to find a large quantity of marijuana and cash in the house. (ECF No. 29, at 5.) The second occurred after Edwards was transported to an SCSO facility, where he was *Mirandized* and then made

---

[13] Edwards does not acknowledge this first set of admissions at all. Indeed, he expressly seeks suppression only of his statements "given after he received *Miranda* warnings." (ECF No. 25, at 11.) However, given that the relief requested in his motion is suppression of "the evidence found in his residence and his subsequent inculpatory statement" (*id.* at 15), the Court will interpret his request as covering all inculpatory statements identified by the United States.

additional incriminating statements about his participation in drug trafficking and his ownership

of the firearms and narcotics found in the house.  (ECF No. 25, at 6; ECF No. 29, at 6.)

"The exclusionary rule bars the admissibility of items seized during an unconstitutional

search . . . and of testimony concerning knowledge acquired during such a search*." United*

*States v. Baldwin*, 114 F. App'x 675, 682 (6th Cir. 2004) (quoting *United States v. Leake*, 95

F.3d 409, 411 (6th Cir. 1996)).  "The rule excludes from admissibility evidence later discovered

and found to be derivative of an illegality or 'fruit of the poisonous tree.'" *Id.* (quoting *Segura v.*

*United States*, 468 U.S. 796, 804 (1984)).  Edwards argues that his confessions are fruit of the

illegal search of his home and that the attenuation exception does not apply.  The United States

does not respond to this argument and instead focuses on whether Edwards's waiver of his

*Miranda* rights was voluntary, knowing, and intelligent.[14]  (ECF No. 29, at 14–15.)

"To exclude evidence under the fruit-of-the-poisonous-tree doctrine, 'the defendant must

show more than the mere fact that a constitutional violation was a "but-for" cause of the police's

obtaining the evidence.'" *United States v. Waide*, 60 F.4th 327, 338 (6th Cir. 2023) (quoting

*United States v. Pearce*, 531 F.3d 374, 381 (6th Cir. 2008)) (internal quotation omitted).  The

attenuation exception asks "whether, granting establishment of the primary illegality, the

evidence to which the instant objection is made has been come at by exploitation of that illegality

or instead by means sufficiently distinguishable to be purged of the primary taint." *Id.* (quoting

*Pearce*, 531 F.3d at 381).  "A confession obtained through custodial interrogation after an illegal

---

[14] "The 'threshold requirement' for admissibility of a confession tainted by illegality is that the
confession must have been voluntary for purposes of the Fifth Amendment.  If the confession
was not voluntary, it must be excluded and no further inquiry is necessary.  If it was voluntary,
then the court must" determine whether attenuation applies. *United States v. Shaw*, 464 F.3d
615, 626 (6th Cir. 2006) (citing *Brown*, 422 U.S. at 604).  Edwards has not argued that his
statements were not voluntary.

arrest must be excluded from evidence unless it is attenuated enough from the arrest that the

confession is 'sufficiently an act of free will to purge the primary taint.'" *Baldwin*, 114 F. App'x

at 683 (quoting *Brown v. Illinois*, 422 U.S. 590, 602 (1975)).  "Demonstration of such

'purgation' is, of course, a function of circumstantial evidence, with the burden of persuasion on

the State." *Shaw*, 464 F.3d at 626 (citing *Brown*, 422 U.S. at 604).  Three factors, derived from

*Brown*, "guide the attenuation inquiry: 'the temporal proximity of the unlawful conduct and the

emergence of the incriminating evidence at issue, the presence of intervening circumstances,

and, particularly, the purpose and flagrancy of the official misconduct.'" *Waide*, 60 F.4th at 339

(quoting *United States v. Williams*, 615 F.3d 657, 669 (6th Cir. 2010)).

As to Edwards's initial spontaneous confession, each of the *Brown* factors indicates that

the attenuation exception does not apply.  First, according to the United States, Edwards made

those statements soon after he discovered police at his home, before they even began searching

(ECF No. 29, at 5), meaning that the statements were practically contemporaneous with the

illegal search.[15]  "That only seconds had passed between the start of the seizure and the

emergence of the evidence indicates that the taint of the illegality had not dissipated." *Williams*,

615 F.3d at 669 (citing *Brown*, 422 U.S. at 604 & n.11).

---

[15] The fact that officers had not yet started searching Edwards's home when he made the
spontaneous confessions does not preclude a finding that those statements are fruit of the
poisonous tree.  "[T]he fruit-of-the-poisonous-tree doctrine may be used to suppress evidence
derived from the threatened use of an unlawful warrant." *Waide*, 60 F.4th at 338.  Here,
Edwards walked up to his home as officers were processing the scene, presumably in preparation
to execute the search warrant, and was already being detained when he made these statements.
(ECF No. 29, at 5.)  "[W]hen a law enforcement officer claims authority to search a home under
a warrant, he announces in effect that the occupant has no right to resist the search." *Waide*, 60
F.4th at 338 (quoting *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968)).  Because such a
situation is "inherently coercive," *id.*, the fruit-of-the-poisonous-tree doctrine can result in
suppression of Edwards's statements even though the illegal search had not yet begun.

Second, no circumstances occurred between the officers' preparations to search the home and Edwards's spontaneous statements. It is true that the spontaneity of a defendant's statement can, in certain circumstances, demonstrate that he "acted 'of free will unaffected by the initial illegality.'" *Rawlings v. Kentucky*, 448 U.S. 98, 108–09 (1980) (quoting *Brown*, 422 U.S. at 603). The defendant in *Rawlings*, who was being illegally detained, claimed ownership of drugs found in his companion's purse upon her prompt that he do so. *Id.* The Court thus found that the defendant's spontaneous admission was a reaction to the intervening discovery of his drugs in his friend's purse, unrelated to the illegal detention, which was sufficient to demonstrate attenuation. *Id.* Here, in contrast, no intervening circumstance prompted Edwards's spontaneous statements—he made them to the officers who were about to illegally search his home as they detained him.

Third, the officers' purpose in exploiting the illegal search weighs against a finding of attenuation. "The Supreme Court has explained that the purposefulness factor is met when the unlawful action is investigatory, that is, when officers unlawfully act in the hope that something might turn up." *Waide*, 60 F.4th at 340 (quoting *Williams*, 615 F.3d at 670). "'[P]urposeful and flagrant' misconduct is not limited to situations where the police act in an outright threatening or coercive manner . . . ." *Shaw*, 464 F.3d at 630 (citing *Dunaway v. New York*, 442 U.S. 200, 218–19 (1979)). "Unwarranted detentions following illegal seizures may demonstrate the type of purposeful and flagrant conduct the exclusionary rule was designed to prevent, especially if the police lack an arguable basis for the detention." *Id.* (quoting *Reed*, 349 F.3d at 465). Given the Court's determination that the search warrant lacked probable cause and that the good faith exception does not apply, this factor weighs against a finding of attenuation. And in any event, the United States has offered nothing to satisfy its burden of demonstrating attenuation.

23

As to Edwards's *Mirandized* statements, the attenuation exception is likewise inapplicable. The fact that Edwards received *Miranda* warnings (and does not contest he knowingly and voluntarily waived his *Miranda* rights) before making the admissions at the SCSO facility supports the admissibility of those statements, but "*Miranda* warnings by themselves are insufficient to purge the taint of an illegal arrest." *Baldwin*, 114 F. App'x at 683. A consideration of the *Brown* factors is therefore necessary.

The first factor weighs against attenuation. Edwards submits, and the United States does not dispute, that he was taken directly from his home after the search to the SCSO facility to be questioned, demonstrating temporal proximity. (ECF No. 25, at 12.)

Second, the United States has identified no intervening circumstances that would "sever the causal connection" between the illegal search and Edwards's statement. *Shaw*, 464 F.3d at 628–29 (quoting *Reed*, 349 F.3d at 464). Though Edwards's previous, spontaneous confessions may have qualified as such intervening circumstances, the Court has already concluded that those statements too are fruit of the poisonous tree and thus cannot lead to attenuation. Nor can the *Miranda* warnings themselves be the requisite intervening circumstance—"[t]he Supreme Court has observed that giving of *Miranda* warnings does not sufficiently break the connection between an illegal arrest or search and a confession." *Baldwin*, 114 F. App'x at 683 (citing *Taylor v. Alabama*, 457 U.S. 687, 691 (1982); *Brown*, 422 U.S. at 605). This factor again weighs against attenuation.

Finally, the analysis of the third factor is the same as above—the officers took Edwards to the SCSO facility to interrogate him after they discovered drugs and guns in an illegal search of his home.

Nothing attenuates the taint of the illegal search on any of Edwards's statements. Those statements should therefore be suppressed.

## **RECOMMENDATION**

For the foregoing reasons, this Court recommends the motion to suppress be granted.

Respectfully submitted this 12th day of July, 2023.

s/Annie T. Christoff
ANNIE T. CHRISTOFF
UNITED STATES MAGISTRATE JUDGE

## **NOTICE**

Within fourteen (14) days after being served with a copy of this report and recommendation, a party may serve and file written objections to the proposed findings and recommendations. Fed. R. Crim. P. 59(b)(2). A party may respond to another party's objections within fourteen (14) days after being served with a copy. Failure to file objections within fourteen (14) days may constitute waiver of objections, exceptions, and further appeal.